<u>Not For Publication</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

|  |  |  |
|---|---|---|
| James E. Saia, | : | |
| | : | |
| Plaintiff, | : | Hon. Joseph H. Rodriguez |
| | : | |
| v. | : | Civil Action No. 05-2876 |
| | : | |
| Haddonfield Area School District, | : | |
| | : | |
| Defendant. | : | **OPINION** |
| | : | |

Rodriguez, J.

Plaintiff James Saia (hereinafter "Saia" or "Plaintiff") was the music teacher at

Haddonfield Memorial High School (hereinafter "HMHS") for two years.  Near the conclusion of

his second year of employment, Saia was informed that his employment contract would not be

renewed for the 2004-2005 school year.  On June 9, 2005, Saia filed a complaint alleging First

Amendment Retaliation under 42 U.S.C. § 1983 and age discrimination claims pursuant to the

Age Discrimination in Employment Act of 1976 (hereinafter the "ADEA"),  29 U.S.C. § 621 <u>et</u>

<u>seq.</u> and the New Jersey Law Against Discrimination (hereinafter the "NJLAD"), N.J.S.A. 10: 5-

1 <u>et seq.</u>   Defendant Haddonfield Board of Education[1] moves for summary judgment as to these

claims.

### <u>FACTS</u>

Plaintiff James Saia is suing the Haddonfield Board of Education for its non-renewal of

---

[1]Defendant Haddonfield Board of Education was improperly plead as Haddonfield Area
School District.

his employment contract[2].  In sum, he claims that his contract was not renewed in retaliation for his comments about the qualifications of Assistant Band Leader Ian Miller (hereinafter "Miller") and because of his age, which qualified him for a higher salary compared to younger music teachers with less experience.

Saia has an extensive musical background, comprised of teaching positions, participation in musical groups and activities, and various degrees in music.  He was hired by HMHS in July 2002 following the unexpected resignation of the music director.  In addition to teaching music, he was the concert band director, marching band director, jazz band director and pit orchestra director for which he received additional stipends. (Saia Deposition at p. 110, attached as Plaintiff's Exhibit. A (hereinafter "Pl. Ex.")).  Although his base salary for teaching was $64,000.00, these ancillary duties raised his annual compensation to approximately $76, 000.00.

In general, despite the short time in which he had to prepare for the 2002-2003 academic school year, Saia enjoyed a good first year with HMHS.  His second year was less successful, marred by controversy with Assistant Band Leader Ian Miller and also due to the fact that he admittedly lost the support and respect of the school administration, band parents, and his students.  Concerns over Saia's performance during the second year of his employment are evident from his periodic performance evaluations; the evaluations went from satisfactory to sub-standard and were increasingly critical of his ability to perform his duties.

Approximately one week after he was hired, Saia conducted Band Camp.  Despite the short period he had to prepare for Camp, it appears Band Camp was a success because he

---

[2] Near the conclusion of the 2003-2004 school year, in lieu of termination or non-renewal of his employment contract, Plaintiff was given the option to resign with the promise of recommendations; Plaintiff chose to resign.

received praise from both the high school administration and parents.  (Saia Dep. at p. 121, attached as Pl. Ex. A)  Although he was not required to do so, Saia entered the band in seven competitions during his first fall as the Band Director.  (Id. at p.132)  It seems that his first year went well, as he received positive feedback from the parents of his students and the administration of the high school.  (Id. at p. 129; Paul Dep. at p. 57, attached as Pl. Ex. B) Indeed, Saia's evaluations that first year included notations such as "[Saia] is to be commended for the wonderful transition that has occurred since he has assumed responsibility in August" (Vimislik Dep. at p.60, attached as Pl. Ex. C; Oct. 11, 2002 Performance review, attached as Pl. Ex. G) and that Saia "came into a difficult situation.  He has provided much stability and continuity in the music program."  (Id. at pp. 62-63; 2002-2003 Interim Evaluation, attached as Pl. Ex. H)  However, despite the positive performance evaluations, Defendant contends that there were concerns regarding Saia's performance during his first year.  Notably, Principal Priscilla Vimislik (hereinafter "Vimilslik"), Assistant Vice Principal Robert Paul (hereinafter "Paul") and Superintendent Ersek expressed concern over Saia's "ability to handle the high school band position, his command of music and his classroom management style."  (Ersek Dep. at p. 58, attached as Def. Ex. G)  The administration attributed these concerns to his inexperience as a band leader and the fact that he had little time to prepare for the academic school year, given the time frame of his hiring.  (Id.)

Principal Vimislik further described the concerns about Saia's performance when she testified about the Spring concert, stating  "The potential problem at the time of the spring musical was that Mr. Saia was not familiar with the music that was being played.  I believe Pirates of Penzance was the music that particular year.  He did not know the music.  He had the

students listening to records of it to learn it." (Vimislik Dep. at p. 67, attached as Def. Ex. E) Additionally, Saia "lost track of when he needed to conduct the orchestra and Mrs. Meyer, who is the choir director, literally from behind the piano had to give signals to the orchestra to keep them on track." (Id. at pp. 68-69) Finally, Assistant Principal Paul verbally communicated to him to "step it up a notch" and to challenge the band members. (Saia Dep. at pp. 133-134, attached as Def. Ex. H) Notwithstanding this testimony, it appears that the written evaluations indicate that Saia had at least satisfactorily met his obligations during the 2002-2003 school year.

His second year was tumultuous. During the Fall of 2003, Defendant hired a new Assistant Band Director, Ian Miller, a former student at the High School, who had the recommendation of both Vimislik and Paul. Saia asserts that Miller was very disagreeable and tried to undermine his authority, resulting in a tenuous year in which the two struggled for power. (Saia Dep. at p.153, attached as Pl. Ex. A) During this year, Saia garnered unsatisfactory performance evaluations, which he blames on the presence of and difficulties with Miller.

It appears that there was immediate tension between Saia and Miller. During Band camp, Saia testified that Miller felt that he was "running the show". (Saia Dep. at pp. 156-157, attached as Def. Ex. H) Saia expressed concern to the administration following the conclusion of Band Camp and continued to express his disgust with Miller during the academic year. (Id.) Further, he was unaware that Miller did not possess the requisite sixty (60) college credits needed in order to be left alone to supervise the students.[3] Both Paul and Vimislik admit that they neglected to check Miller's background. (Vimislik Dep. at p. 90, attached as Pl. Ex. C; Paul Dep. at pp. 45,

---

[3] The parties have not put forth any evidence of the authority for the "sixty (60) credit" requirement. During oral argument, the parties could not identify the origin of this requirement.

51, attached as Pl. Ex. B)   Eventually, Miller was "demoted" to a volunteer.  Nevertheless, Saia's performance continued to be a source of concern for the school administration.

With respect to Saia's performance during the 2003-2004 school year, the initial written evaluations seemed to signal a continuum of the success he enjoyed during his first year.  During the Fall of 2003, he prepared the band to perform for then-Governor James McGreevey.  The performance prompted Principal Vimislik to opine in a letter to Saia that he did  "a spectacular job in representing the High School and the band members did an outstanding job".  (Vimislik Dep. at p. 153, attached as Pl. Ex. C) This appears to be the last positive comment he received. After October 2003, Saia asserts that he received no support from Defendant and that his evaluations abruptly went from positive to negative.  (Saia Dep. at pp.179, 168, attached as Pl. Ex. A)

In November, Saia received a "lessons need improvement" evaluation after Principal Vimislik conducted a classroom observation of Saia.  (Vimislik Dep. at p. 151, attached as Pl. Ex. C) Furthermore, Saia testified that the "Band Parents", also referred to as the  "Band Boosters", who apparently are very influential with respect to hiring and firing, met with the administration at least one time unbeknownst to him to discuss his future with the school.  (Id. at pp. 169, 171-172)  Saia theorizes that during this meeting with the Band Parents, Vimislik encouraged the parents to push for his termination.  (Saia Dep. at 175-76, attached as Pl. Ex. A) Midway through the school year, Saia admits he lost the support of his students and their parents and was, essentially, "dinner talk". (Saia Dep. at pp. 180-181, attached as Def. Ex. H)  Although the January assessment evinced a satisfactory rating, members of the Band Boosters requested a private meeting with Principal Vimislik, during which they expressed their concerns regarding

Saia's lack of supervision, lack of skill, lack of knowledge of music appropriate for the high

school level and noted the diminished level of accomplishment during the concert events. (See

generally Cert. of Elizabeth Olsen, attached as Def. Ex.7)  Saia's March 2004 interim review

again called for him to improve his performance.  (Vimislik Dep. at pp. 186-87, attached as Def.

Ex. E)  An interim report issued for September through February noted the lack of structure in

Saia's class and a concern that not enough 8th Grade students were signing up for band,

jeopardizing the existence of a Marching Band for the following scholastic year. (Interim

Evaluation, attached as Def. Ex. R)  Saia was notified of his resignation option on March 26,

2004.  The Court will consider Defendant's motion for summary judgment against this factual

backdrop.

## DISCUSSION

## A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the Court is satisfied that "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986);

Fed. R. Civ. P. 5(c).  An issue is "genuine" if it is supported by evidence such that a reasonable

jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute

about the fact might affect the outcome of the suit.  Id.  In deciding the merits of a party's motion

for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the

matter, but to determine whether there is a genuine issue for trial. Id.  Consequently, a district

court may not make credibility determinations or engage in any weighing of the evidence;
instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be
drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting
Anderson, 477 U.S. at 255).

The basic framework of summary judgment places the initial burden of demonstrating the
absence of a genuine issue of material fact upon the moving party. Celotex Corp., 477 U.S. at
323.  Once the moving party has met this burden, the nonmoving party must identify, by
affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.  Thus, to
withstand a properly supported motion for summary judgment, the nonmoving party must
identify specific facts and affirmative evidence that contradict those offered by the moving party.
Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest
upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d
228, 232 (3d Cir. 2001).  Indeed, the plain language of Rule 56(c) mandates the entry of
summary judgment, after adequate time for discovery and upon motion, against a party who fails
to make a showing sufficient to establish the existence of an element essential to that party's
case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

## B. PLAINTIFF'S CLAIM OF FIRST AMENDMENT RETALIATION

To establish a prima facie case of retaliation, a plaintiff must demonstrate three things: 1)
that he engaged in a protected activity; 2) that the employer took an adverse action; and 3) that a
causal link exists between the plaintiff's protected activity and the employer's adverse action.
Baldassare, 250 F.3d at 194-195;  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir.
2000).   Under this framework, the first prong is a question of law, while the second and third

prongs are questions of fact.  Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir.2006).

To show that the speech was protected, Saia must demonstrate that the speech was a "matter of

public concern".  Here, Saia claims that he was fired in retaliation for speaking out about his

concerns with Miller; specifically, speech related to the fact that Miller was unqualified for the

position because he did not have the requisite number of college credits.

The First Amendment protects statements made by public employees on matters of public

concern.  Pickering v. Board of Ed. of Township High School District 205, 391 U.S. 563, 573, 88

S.Ct. 1971 (1968).   Indeed, "[a] public employee has a Constitutional right to speak on matters

of public concern without fear of retaliation."  Baldassare v. The State of N.J., 250 F.3d 188,

194-195 (3d Cir. 2001)(citing Rankin v. McPherson, 438 U.S. 378, 383-84, 107 S.Ct. 2891

(1987); Feldman v. Phila. Hous. Auth., 43 F.3d 823, 829 (3d Cir.1994) ("A state cannot lawfully

discharge an employee for reasons that infringe upon that employee's constitutionally protected

interest in freedom of speech.")).   "A public employee's speech involves a matter of public

concern if it 'can be fairly considered as relating to any matter of political, social, or other

concern to the community.'" Green v. Phila. Hous. Auth., 105 F.3d 882, 885-86 (3d Cir.

1997)(quoting Connick v. Meyers, 461 U.S. 138, 146, 103 S.Ct 1684 (1983)).   While speech

related to "broad social or policy issues is a matter of public concern" Sanguigni v. Pittsburgh

Bd. of Pu. Ed., 968 F.2d 393, 397 (3d Cir. 1992), speech that airs personal grievances is not

considered a matter of public concern.  Swineford v. Snyder Co. Pa., 15 F.3d 1258, 1271 (3d Cir.

1994).

Although there is no bright line rule in this arena, courts are to "focus on the content,

form, and context of the activity in question" in determining whether the speech warrants First

Amendment protection. Baldassare, 250 F.3d at 195.  In addition, while not determinative, courts are also to consider the speaker's motivation in making the statements.  Cooper, 175 F.Supp.2d at 744 (quoting Zamboni v. Stamler, 847 F.2d 73, 78 (3d Cir. 1988)(citations omitted).  Because the First Amendment does not protect employees from discipline based on speech made pursuant to their official job duties[4],  the forgoing inquiries are relevant to determine whether the speech was made as "'a citizen upon matters of public concern or as a volunteer upon matters only of personal interest.'"  Kadetsky v. Egg Harbor Twp. Bd. of Ed., 164 F.Supp.2d 425, 435 (D.N.J. 2001)(quoting Versage v. Twp. of Clinton N.J., 984 F.2d 1359, 1364 (3d Cir. 1993)(quoting Connick, 461 U.S. at 147)).  For example, this Court, in Cooper v. Cape May Co. Bd. of Soc. Servs., held that speech related to a supervisor's behavior was not protected because public interest was lacking. 75 F.Supp.2d 732, 743-44 (D.N.J. 2001)  Likewise, in Kadetsky, this Court found that a teacher's speech regarding school policy was not a matter of public concern because the speech was motivated by plaintiff's desire to protect his reputation rather than to expose "errant school policies or malfeasance on the part of his superiors for the betterment of the public."  164 F.Supp.2d at 435.

Here, Saia admits that his personal grievances with Miller are not a matter of public concern and do not form the basis for his protected speech claim.  Instead, Saia asserts that "as a result of oversight, incompetence or something else on the part of Defendant administration, an uncertified student was being left alone with the students." (Pl. Opp. at p. 7)  Specifically, Saia

---

[4]"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti v. Ceballos, 126 S.Ct. 1951, 1958 (2006),.

points to his speech regarding Miller's lack of qualifications for Assistant Band Leader and the fact that the administration put an uncredentialed individual in that position. "Undoubtedly, the fact that a school district is not only employing an uncertified individual, but is improperly allowing that individual to be left alone with students would be of high concern to the Haddonfield community." (Id. at 5)

After considering the content, form, and context of Saia's speech, the Court finds that the speech is not a matter of public concern.  First, with respect to the content of the speech, some discussion of the importance of the Assistant Band Director having acquired sixty (60) college credits is warranted.  Although the record is devoid of a job description or any other authoritative document that details the credit requirements for an Assistant Band Director, counsel for both parties had the opportunity to query Principal Vimislik and Assistant Principal Paul on the origin of the sixty credit requirement and the circumstances that caused them to learn that Mr. Miller did not satisfy this requirement.  The "sixty credit requirement" was also discussed during the course of oral argument before the Court.  However, the most helpful discussion of the importance of the "sixty credit requirement" is found in the deposition testimony of Principal Vimislik.

Upon learning that Miller was supervising students without Saia being present, Vimislik told Saia that "[i]n order to supervise students on your own you must have a minimum of 60 college credits." (Vimislik Dep. at p.100, attached as Def.  Ex. C.)  Vimislik also testified that "[i]t is normal for most assistants to have 60 college credits." (Id. at p. 87)  However, Vimislik distinguished the hiring of a teacher from the hiring of someone in an assistants role.

"Q.     So are you telling me for an assistant you don't seek verification and it is not required?

* * *

  THE WITNESS: It would be required at some point, yes.  But it is – the process for hiring a teacher, like you must have all of those pieces in place.  You must show that you have a teaching certificate for the State of New Jersey.

  I mean, it is a very involved process to hire a teacher versus, say, a Costume Director for the play." (Id. at p. 90)

  Here, Miller was a recent graduate of HMHS and was known to both the administration and the band parents before he was hired.  During his deposition, Saia acknowledged that the endorsement of the band parents was a factor in his decision to hire Mr. Miller over another candidate. "I liked them both, but my gut reaction was to choose the drum major's brother, but because the band parents had boasted about Ian and Mr. Paul boasted about Ian, I chose Mr. Miller, Ian Miller."  (Saia Dep., p. 150 attached as Def. Ex. H)  Additionally, Miller was permitted to remain with the band as an unpaid volunteer after it was discovered that he did not possess enough credits to remain with the band as a paid Assistant Band Director.  The deficiency had only administrative ramifications in terms of pay and supervisory ability. (See Anecdotal Record, attached as Def. Ex. J)  It did not render Mr. Miller unable to have contact with the band or unable to help the students with instruction, as Mr. Miller continued to perform various duties as a volunteer.  Furthermore, the presence of Miller exacted no harm on the community; the Band Parents endorsed his hiring and Miller was permitted to have influence over the members of the band even after it was determined that he was unqualified.[5]  Thus, the alleged administrative deviation from background checking procedures in this case is not a matter of public concern

---

  [5]Ironically, the community that Saia professes he was trying to protect, was instrumental in the decision to hire Miller and fire Saia (See Cert. of Elizabeth Olson, attached as Def. Ex. 7).

Likewise, the form and context of Saia's statements also indicate that the speech was not a matter of public concern. Saia's speech can be broken down into two forms: the speech contained in the October 8, 2003 memorandum and the oral speech directed at various members of the administration, other teachers and the superintendent. First, the memorandum was generated by Saia in response to a memorandum authored by Vimislik. Principal Vimislik's memorandum states that Miller does not have the requisite credentials to continue as Assistant Band Director and goes on to identify the necessary steps to be taken by Saia until such time as an appropriate replacement can be found for Miller. Saia responds as follows:

> This letter is in response to a number of concerns that I have regarding my recent anecdotal record.
> 1.  As a member of the teaching staff, it is not my responsibility to ascertain the qualifications, credentials, and eligibility of individuals employed by the District. That is solely the purview of the Administration.
> 2. Mr. Robert Paul recommended Ian Miller to me for the position of assistant Bandleader.  It is reasonable to assume that Mr. Paul or some other administrator checked Ian's credentials.
> 3.5. With an issue as critical as district liability, I should be informed (preferably in writing) of Mr. Miller's inadequacies by an administer, and not by Mrs. Barbano.
> 6. Since Mr. Miller is hired and employed by the district, any changes or restrictions in his job description should come from the administration, and not from me.

(Anecdotal Report of October 8, 2003, attached as Pl. Ex. M.)

Principal Vimislik is the first to acknowledge Miller's credentials deficiency; it is not exposed by Saia.  Mr. Saia's memorandum in response questions why the administration failed to check the credentials of Miller and another assistant, asserts that it is the job of the administration to verify the qualifications of faculty members, and attempts to insulate himself from any potential backlash for utilizing an unqualified Band Assistant.  Saia only comments on the Miller

situation in his own memo, he does not expose it.

Second, the speech directed at the administration and superintendent only reiterates Saia's concerns that Miller be removed and that he should not be held responsible for the failure of the administration to conduct the necessary due diligence with regards to Miller's hiring.  In addition, this speech includes Saia's assessment that, in addition to failing to meet the sixty credit requirement, Miller did not possess the necessary musical and leadership skills to be effective. Saia testified that he expressed all of these concerns to "Mr. Paul, Ms. Vimislik and the athletic director and Bruce Cecchini, my union representative."  (Saia Dep at pp. 193-194, attached as Pl. Ex. A).  Saia also voiced these concerns to Superintendent Ersek. ( Id. at 193.)  Saia learned the fate of Miller when he initiated a phone conversation with the superintendent to discuss Miller and was informed that the district was permitting Miller to remain with the band as a volunteer. "I, in turn, called Dr. Ersek.  Dr. Ersek, the superintendent, said, Jim, he's now a volunteer.  And there was a follow-up letter to that affect that both Miller and the color guard student who were paid were now volunteers."  (Saia Dep. at p. 185, attached as Pl. Ex. A)

In addition, the speech is not made in a public forum, or in an open meeting where it would more likely indicate that Saia's true intent was to expose potential malfeasance on the part of the administration. See Cooper, 175 F.Supp.2d 732 (In determining that Plaintiff's speech regarding complaints of administrative misfeasance on the part of the County was not a matter of public concern, the court considered many factors, including the fact that "[p]laintiff expressed his speech in many informal settings, including letters, phone calls, and meetings with officials at the Board, his union, and the DOP."); Sanguigni, 968 F.2d at 399 (Noting that statements critical of school administration contained in a school newsletter were not a matter of public concern,

13

unlike those in <u>Zamboni</u>, as the comments "were not made as part of a judicial or administrative proceedings...".)  Instead, this speech is contained in a document responsive to criticisms from the administration and directed at the administration orally. Thus, the form and context of Saia's speech does not suggest that the speech was made on behalf of the Haddonfield Community.

Rather, the form and forum of Saia's speech suggests that the speech was motivated by a desire to dispose of Miller, who had become a source of frustration.  In this regard, Saia's speech can aptly be likened to the speech in <u>Kadetsky</u>.  In that case, Kadetsky, a band leader, claimed retaliation for a report he filed detailing improper behavior on the part of another faculty member.  The basis of the lawsuit alleged that the Principal and Plaintiff's supervisor set out to make a false record of poor work performance during the year Plaintiff was slated to be tenured. <u>Id</u>. at 430.  The Principal put a letter in Plaintiff's file, alleging insubordination for failing to obtain permission to take a personal day when Plaintiff met with his Union Representative to discuss the false records.  Kadetsky also alleged that the Principal and Supervisor engineered a complaint by a student alleging improper conduct on his part. In analyzing the claim, the Court noted that "[a]lthough Kadetsky characterizes his speech as challenging "defendants' violation of the collective bargaining agreement" and a "violation of the school districts [sic] Sexual Harassment Policy" (citations omitted), the summary judgment record indicates that Kadetsky was motivated at all times by concern for his personal employment, rather than by a desire to expose errant school policies or malfeasance on the part of his superiors for the betterment of the public." <u>Id</u>.  The Court noted the compilation of cases cited in the <u>Swineford</u> opinion in support of this conclusion:

> "To illustrate the distinction between personal grievances and disclosure of
> official misfeasance, <u>Swineford</u> collected cases where the criticisms of public

employees were found to be matters of public concern: <u>Zamboni v. Stamler</u>, 847 F.2d 73, 77 (3d. Cir. 1988)(civil service employee's criticism of county prosecutor's reorganization and promotion plan); <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1201 (3d Cir.1988)(state police civilian employee's communication to the press of racial profiling); <u>Czurlanis v. Albanese</u>, 721 F.2d 98, 104 (3d Cir.1983)(county auto mechanic's criticism of internal management of Department of Motor Vehicles); <u>Trotman v. Board of Trustees</u>, 635 F.2d 216, 225 (3d Cir.1980)(professor's criticism of university president's efforts to increase the school's faculty/student ratio)." <u>Id.</u>

Here, the presence of conflict between Saia and Miller casts doubt over the motivation of Saia's speech relating to Miller's credit deficiency.  It is clear from the record that Saia did not welcome Miller's assistance.  He characterized Miller as "disagreeable" and  "full of himself", and stated that Miller "undermined my authority and also started a buzz about me that I was incompetent to the students."  (Saia Dep, at p. 153, attached as Pl Ex. A.)   Saia attests that his difficulties with Miller started at the commencement of band camp and lasted until the last day of the marching band season in mid November.  (<u>Id.</u> at pp. 151-165)   During this time, he alleges that Miller started a website that was critical of the band's performance and cast the band in a negative light.  (<u>Id.</u> at 163)   Saia continuously expressed his frustration with Miller to the administration, who, according to Saia, did not act.  (<u>Id.</u> at pp.156-158)

After it became known that Miller was not qualified for the position, Saia pushed for Miller's termination within the confines of the school administration and district.  He did not seek to inform the influential Band Boosters, whose children would have been the students potentially "harmed" by Miller's presence.  In light of Saia's frustration with Miller and the forum of his speech, Saia's motivation leans more towards self-interest, rather than community betterment.  Put differently, it appears that Saia sought the termination of Miller for his own benefit rather than for the "protection" of the band.

15

After considering the content, form, and context of the speech, and the likely motivation behind the speech, the speech does not constitute a matter of public concern.  Accordingly, Defendant's motion for summary judgment on Saia's claim for First Amendment retaliation will be granted.

## C. PLAINTIFF'S AGE DISCRIMINATION CLAIMS UNDER THE ADEA AND NJLAD

The ADEA states that it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  The NJLAD affords similar protection, but does not limit the age restriction to forty years.  Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 300 (3d Cir. 2004). Claims brought under the ADEA and NJLAD are considered under the same analytical framework applicable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Waldron v. SL Indust., 56 F.3d 491, 504 (3d Cir. 1995).

In this case there is no direct evidence of age discrimination, triggering the analytical framework pronounced in by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1983).  Pursuant to McDonnell Douglas, the plaintiff bears the initial burden of establishing a prima facie case of unlawful discrimination.  In an age discrimination case, a prima facie case is established where plaintiff can show that he: (1) was a member of the protected class, i.e., was over 40 years old; (2) was qualified for the position; (3) suffered an adverse employment decision; and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination. Id. at 802;  Monaco, 359 F.3d at 300. Under this burden shifting paradigm, if the plaintiff is successful in establishing the prima facie case, defendant must "articulate a

16

legitimate, nondiscriminatory reason" for the adverse employment action.  McDonnell Douglas,

411 U.S. at 803.  Where defendant satisfies this burden, "the plaintiff then must have an

opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by

the defendant were not its true reasons, but were a pretext for discrimination."  Jones v. Sch.

Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999) (citing Texas Dep't of Cmty. Affairs v. Burdine,

450 U.S. 248, 252-53 (1981)).

Here, Saia has established a prima facie case of age discrimination: he was over forty

years of age at the time he was forced to resign, there is evidence that he was at least minimally

qualified for the position, he suffered an adverse employment action, and he was replaced by a

younger person. Defendant has put forth a legitimate, nondiscriminatory reason for choosing to

forgo renewal of Saia's employment contract: unsatisfactory performance.  Thus, the issue before

the Court is whether Plaintiff has met his burden of demonstrating that Defendant's reasons for

not renewing his employment contract are a pretext for discrimination.

To satisfy this burden on a motion for summary judgment, plaintiff must "point to some

evidence, direct or circumstantial, from which a fact finder could reasonably either: (1)

disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action."  Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 330-31 (3d Cir.

1995) (citing Fuentes v. Perskie, 32 F.3d 759, 763-64 (3d Cir. 1994)).  The fact finder may infer

from the combination of the plaintiff's prima facie case, as well as its own rejection of the

employer's proffered non-discriminatory reason, that the employer unlawfully discriminated

against the plaintiff and was merely trying to conceal its illegal act with the articulated reason.

Hicks, 509 U.S. at 510-11.     However, the plaintiff cannot simply show that the employer's

decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory

animus motivated the employer, not whether the employer is "wise, shrewd, prudent, or

competent."  Fuentes, 32 F.3d at 765 (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983

F.2d 509, 533 (3d Cir. 1992)).  Instead, plaintiff must show such "weaknesses, implausibilities,

inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for

its action that a reasonable fact finder could rationally find them unworthy of credence, and

hence infer that the employer did not act for [the asserted] non-discriminatory reasons."  Id.

A review of Saia's performance evaluations is warranted.  In October 2003, Saia's

evaluation was marked  "Satisfactory", with a notation that "[s]tudent[s] must enter the room

more quickly, take out their instruments and be ready to play. . . it is critical that you are at the

podium before students enter the room." (Def. Ex. N)  The November 5, 2003 evaluation was

rated "Lessons Need Improvement".  This evaluation expresses a concern that the students were

not listening to Saia: " There was a lot of side chatter on the part of the students during the class.

I have a real concern that you have lost control of the group. . .Jim, you need to work to regain

the respect of the members of the band.  I have some serious concerns regarding your relationship

with the students and how you are perceived by the students and their parents at this time."

(Def. Ex. O)   During this period, Saia acknowledged that he had lost the support of the students

and their parents. (Saia Dep. at pp. 180-181, attaches as Def. Ex. H)  Saia's January 14, 2004

evaluation was deemed "Satisfactory".  The evaluation included comments geared toward

guiding the students through difficult musical combinations. (Def. Ex. P)  The February 2004

Interim Evaluation (signed on March 4, 2004) has a rating of "Does Not Meet District

Standards".  The evaluation lists failures in the areas of supervision of rehearsals and competitions, classroom management, setting high standards, methods of instruction and recruitment. Vimislik's comments are extensive and inclusive of concerns that plagued Saia during this school year. Def. Ex. Q)

Some of the satisfactory evaluations note that the band needs to be challenged more and that Saia needs to reign in his students.  Further, Saia admits that his second year was not as good as his first year.

> "Q. Do you agree that you had not done that well when Ian was there?
> A. I did the best I could under the circumstances. . .
> Q. And you felt that Ian got you off track?
> A. Absolutely."

(Saia Dep at pp. 202-203, attached as Def. Ex. H)  Although Saia attributes the downswing of his evaluations to the presence of Miller, his performance continued to garner unfavorable performance reviews even after Miller was "demoted" to a volunteer.

In addition to the concerns expressed in the performance evaluations, the influential Band Boosters were dissatisfied with Saia's performance. One parent submitted a certification that outlined her concerns with Saia.  "As a Band Booster, and as a parent of students in the HMHS music program, I had an opportunity to observe various aspects of the music program, including practices and performances.  I also had many opportunities to directly observe the plaintiff, James Saia." (Cert. of Elizabeth Olson at ¶ 7, attached as Def. Ex. 7) Ms. Olson observed that "the music program was plagued by disorganization" and that Saia was "seriously deficient in his supervision of his students" (Id. at ¶¶9, 19) Concerns over cancelled rehearsals, early dismissals, and turning band class into a study hall period were brought to the attention of the administration by the Band Boosters.  (Id. at ¶¶ 15, 23, 27, 31)

"31. Ultimately, during Mr. Saia's second year of employment, the Band
Boosters demanded a meeting with Principal Priscilla Vimislik specifically to
discuss Mr. Saia and his continued employment at HMHS.
32. I attended this meeting and I recall that there were approximately 15 other
parents present.
33. Those parents, including myself, expressed dissatisfaction with Mr. Saia's
performance and requested that his employment at HMHS be discontinued."
(Cert. of Elizabeth Olsen, attached as Def. Ex.7)

Taken together, the performance evaluations and the desires of the band parents constitute

a legitimate, nondiscriminatory reason for Saia's adverse employment action.  Plaintiff has failed

to put forth any evidence that the adverse employment action was predicated upon a

discriminatory motive.  There is no indication that Saia's age, or salary by virtue of his age, were

ever discussed by anyone with the authority or influence over his employment.  The only

evidence tendered by Saia regarding his age are statements made by the outgoing band leader and

the Haddonfield Middle School Music teacher.

According to Saia, Christopher Tumminia, Saia's predecessor, told him "be careful, Jim,

within a year or two, they'll try to get rid of you... to save money."  (Saia Dep. at pp. 255-256,

attached as Def. Ex. E)  Additionally, Mr. Uibel, the Middle School Music Teacher told Saia

that "band is a young man's game". (Id. at 195)   Indeed, during oral argument, Saia

acknowledged that he did not have any evidence or reason to believe that either of these men

contributed to his forced resignation.  Moreover, during his deposition, he admitted that Principal

Vimislik never indicated that his age was a factor in his firing.

"Q. Ok. Did Principal Vimislik ever give any indication to you that she wanted to
let you go because of your age?
A. No, not she.
Q. Who did?
A. Mr. Uibel.
Q. Mr. Uibel. What did he say?
A. When I called Steve Uibel after band camp, after the Ian regime, around

20

February, I wanted his thoughts on what had happened and reflected back on how
this could get this out of hand.  He said well, Jim, I am surprised that the District
hired you, period. I said why.  He said everyone knows that the band is a young
man's game.
Q. Is that it?
A. That's it.
Q. Ok. Did Mr. Uibel play any part in the decision to either recommend your non
renewal or termination?
A. That I don't know.
      *       *       *
Q. Ok. Any reason to believe that Mr. Uibel would have recommended to
someone that the get rid of you because of your age?
A. No."

(Saia Dep. at pp. 195-196, attached as Def. Ex. E)

There is no evidence, direct or circumstantial, that casts sufficient doubt on Defendant's

articulated reasons for refusing to renew Plaintiff's employment contract.  As a result, summary

judgment will be entered against Saia's claims under the ADEA and NJLAD.

## CONCLUSION

_____The Court finds that, as a matter of law, Saia's speech does not constitute a matter

of public concern.  The Court further finds that there is no evidence in the record to suggest that

Defendant's proffered reason for the non-renewal of Saia's employment contract was motivated

by discriminatory animus.  As a result, summary judgment is GRANTED as to all claims. An

appropriate Order will follow.


Dated September _10_, 2007.

                                    /s/ Joseph H. Rodriguez_____
_____        JOSEPH H. RODRIGUEZ,
                                   United States District Judge


_____

21